# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:19-CR-778 ERW/PLC |
| ) | |
| WILEY S. WILLIAMS, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court following a hearing on Defendant's Motion to Suppress Evidence and Statements Taken on September 4, 2019 at 1870 Nottinghill Row Dr. (Apt. K) [ECF No. 31] and Defendant's Motion to Suppress Statements Taken from Defendant on September 4, 2019 [ECF No. 32]. The Court held a hearing.

## Factual Background

During the early morning of September 4, 2019, officers with the Florissant Police Department responded to an apartment building at 1870 Nottinghill Row to investigate recently received 911 calls for "shots fired." Sergeant Jarrod Coder, who has worked for the Florissant Police Department for sixteen years, was on duty at the time and reported to 1870 Nottinghill Row within minutes. At the time Sergeant Coder arrived, other Florissant police officers were present at the scene. At least, two officers at the scene when Sergeant Coder arrived had personally heard the gunshots.

One or more of the 911 callers referenced a silver Jeep on the parking lot at the Nottinghill Row address. The officers at the scene escorted Sergeant Coder to a silver Jeep parked on the 1870 Nottinghill parking lot. On the ground around the Jeep, Sergeant Coder observed a variety

of items, including multiple shell casings, pills in baggies, marijuana, one black tennis shoe, a black digital scale, a cellphone, and a liquid substance that appeared to be blood,[1] which also appeared to be on the driver's side of the Jeep.

While he was at the scene, Sergeant Coder spoke to witnesses to the shooting. One witness saw, from a bedroom window looking "directly down to the parking lot," "individuals by the silver Jeep shooting." The other witness identified a specific balcony or deck and stated that a "subject" on the balcony shot a firearm in the direction of the silver Jeep. The witness identified the balcony as attached to Apartment K.

Sergeant Coder and other officers approached Apartment K, knocked on the door and announced "Florissant Police." Immediately outside the door to Apartment K, there were shell casings. There was no response from inside the apartment to multiple knocks. Consequently, a Florissant police officer contacted a Nottinghill Row apartment complex maintenance worker.

Using a key provided by the maintenance worker, officers opened the Apartment K door and remained at the threshold, while announcing who they were and asking anyone in the apartment to "announce [or show] themselves." Three people appeared inside Apartment K. All were ordered to show their hands and exit the apartment. The three individuals complied and were handcuffed.

After the individuals exited Apartment K, Florissant police officers entered the apartment and performed a "tactical protective sweep" for the purpose of locating any additional people in the apartment. While performing the protective sweep, Sergeant Coder observed on the floor of the dining area a black tennis shoe "identical to the one that was found" previously and another black digital scale.

---

[1] The substance was subsequently tested and found to be blood.

2

On cross-examination of Sergeant Coder, defense counsel established that Sergeant Coder did not attempt to obtain a search warrant for Apartment K. Sergeant Coder also acknowledged that, prior to gaining entry to the apartment, he had not called an ambulance or the fire department, had not tested the substance thought to be blood or checked the silver Jeep for fingerprints, had not determined ownership of the silver Jeep, and could not determine from the position of the shell casings in which direction shots were fired.

Detective Jodi Chapie, who has worked for the Florissant Police Department for more than three years, testified that she was summoned to report to a shooting at 1870 Nottinghill Row on September 4, 2019. After arriving at the scene, Detective Chapie remained outside the building and then outside Apartment K until an individual from inside that apartment, identified as Justin Tharp, was brought to her. While accompanying Detective Chapie to her patrol car, Mr. Tharp remarked: "Man, my friend just got into some shit." After Detective Chapie placed Mr. Tharp in her patrol car, they conversed. Mr. Tharp told her he lived at 1870 Nottinghill Row Apartment K.[2] Mr. Tharp said that his friend, Defendant, had texted Mr. Tharp that evening asking for a place to stay because "he had gotten put out [by] his parents." Mr. Tharp told Detective Chapie Defendant had never been to Mr. Tharp's apartment prior to that night, although Defendant had been to the apartment complex "because he knew other people [in] other units." Mr. Tharp believed that Defendant was going to stay the night at Apartment K but he also believed Defendant was leaving the apartment.

While Mr. Tharp was seated in the patrol car at the scene, Detective Chapie explained the nature of the investigation and asked Mr. Tharp if it was "okay with him" if the Florissant police officers searched his apartment. Detective Chapie testified that Mr. Tharp said the police officers

---

[2] Mr. Tharp also stated that his brother lived in apartment K and his brother was not there.

3

could "do what they have to do, because this doesn't involve me." Detective Chapie then presented Mr. Tharp with a "consent to search and seize" form for Apartment K [Gov't Exhibit 2] ("consent to search form"). Mr. Tharp signed the consent to search form permitting a search of his residence, and Detective Chapie conveyed his consent to search Apartment K to other officers at the scene.[3]

Detective Mark Nardoni, who had been a police officer for eleven years and with the Florissant Police Department for six years, received a call in the early morning of September 4, 2019, asking him to respond to 1870 Nottinghill Row regarding "a shooting that had just occurred." At the scene, Sergeant Coder asked Detective Nardoni to take custody of an individual, later identified as Defendant, who had been inside Apartment K. Detective Nardoni met Defendant outside the apartment building and did not observe that Defendant was or appeared physically injured, nor did Defendant complain of being injured. Detective Nardoni took Defendant to his police vehicle, transported him to the Florissant Police Department, and placed Defendant in an interview room.

At approximately 2:40 a.m. on September 4, 2019, Detective Nardoni administered Miranda warnings to Defendant in the interview room. When asked if he understood his rights, Defendant said "yes, sir" and nodded his head. The interview lasted approximately an hour.[4] Detective Nardoni testified that Defendant was cooperative throughout the interview, did not ask

---

[3] Detective Chapie further testified that she spoke with the third individual in the apartment, who was Mr. Tharp's girlfriend. Mr. Tharp's girlfriend told Detective Chapie that she was at Mr. Tharp's apartment frequently and had never seen Defendant spend the night there but had seen Defendant "once or twice around the apartment building with other friends."

[4] Detective Nardoni estimated this first interview lasted approximately one hour. The recording of this interview session [Gov't Ex. 3] is almost two hours long and shows Detective Nardoni's questioning of Defendant for approximately twenty-four minutes before he leaves the interview room for about twenty minutes. When Detective Nardoni returned (for about two minutes) he asked Defendant for clarification of an aspect of information Defendant had disclosed in response to the initial questions. The remainder of this recording shows several brief visits by Detective Chapie (to obtain Defendant's DNA samples and inquire about access to and information on Defendant's cell phones) and a brief visit by Detective Nardoni when he showed Defendant a six-picture photo array.

4

for a lawyer or refuse to speak with Detective Nardoni, did not indicate he had difficulty understanding or communicating with Detective Nardoni, and answered Detective Nardoni's questions.[5] Detective Nardoni also observed that Defendant did not appear intoxicated or confused, did not slur his speech or make "nonsensical" statements, did not report that he had used any kind of drugs that evening, and did not appear to exhibit "any signs of intoxication of any kind." For this interview, Detective Nardoni was not dressed in a police uniform and was not armed. Detective Nardoni stated that, during the interview, he did not shout, threaten Defendant, make promises or offers to Defendant in exchange for his answers.

During the interview, Defendant provided Detective Nardoni with his home address: 7242 Hazelcrest Drive in Hazelwood, Missouri. At no time, did Defendant state that he lived at 1870 Nottinghill Row, Apartment K. Additionally, during this first interview, Defendant confirmed that he had possessed a gun that evening and had met with individuals who drove a silver Jeep in the parking lot at 1870 Nottinghill Row. Defendant provided Detective Nardoni with nicknames of one or more of the individuals he met.

During the course of three other meetings with Detective Nardoni later on September 4, 2019, Defendant reviewed photographic lineups.[6] Detective Nardoni further stated that, at no time during his four conversations with Defendant on September 4, 2019, did Defendant request an

---

[5] The recording of this interview [Gov't Ex. 3] supports Detective Nardoni's testimony regarding Defendant's demeanor and Detective Nardoni's appearance and conduct as set forth in the text.

[6] The recordings of these interviews indicate they each lasted approximately seven minutes, six minutes, and two minutes, respectively, with the second one beginning at 4:19 p.m., the third starting at 10:49 p.m. and the fourth beginning at 11:45 p.m.

5

attorney[7] or state he did not want to talk anymore.[8]  The recordings reveal that Detective Nardoni advised Defendant of his Miranda rights at the very beginning of each meeting.

Without objection, the Government introduced during the hearing recordings of each of Defendant's four interviews [Gov't Exs. 3 through 6], which the Court has reviewed.

### Discussion

A. Statements

Defendant contends that his statements to the Florissant police should be suppressed because: (1) "there is no real evidence" that Defendant "fully understood his Miranda Rights"; and (2) Defendant asked, at the start of the second interview, "do I get to call my lawyer."  More specifically with respect to understanding his rights, Defendant contends that (1) with respect to the first interview, he barely nodded his head when asked if he understood his rights and (2) he "was under the influence" at the time.  To summarize Defendant's position: "The key question is whether the warnings were understood by [Defendant]."[9]

Due process imposes on a federal court a duty to ascertain the voluntariness of a defendant's confession - whether the confession arises out of "'inherently coercive'" police conduct or under circumstances suggesting "the confession is unlikely to have been the product of a free and rational will."  Miller v. Fenton, 474 U.S. 104, 110 (1985) (citing Ashcraft v. Tennessee,

---

[7] The recording of the second interview shows that when Detective Nardoni asked if Defendant understood the rights he had stated, Defendant initially responded, "Do I get to call my lawyer? I still haven't made a phone call yet." Detective Nardoni replied he was asking Defendant if Defendant understood his rights, and Defendant replied that he did, then the two discussed a photo array Detective Nardoni had brought with him. At no other time during any of the interviews, did Defendant mention an attorney.

[8] The recordings of the interviews disclose that Defendant did not ask to stop any of the sessions at any point.

[9] Defendant also summarily suggests that his statements should be suppressed as "fruit of the [allegedly] illegal entry and search" of 1870 Nottinghill Dr., Apartment K [ECF No. 31 at 5]. Defendant provides no argument or analysis with respect to this assertion, and the Court therefore declines to address it. In any event, as discussed more fully below, the search of Apartment K did not violate the 4th Amendment.

322 U.S. 143, 154 (1944) for first quotation and Mincey v. Arizona, 437 U.S. 385, 401 (1978) for second quotation). There is no "talismanic definition of 'voluntariness,'" and a court must determine whether a statement was voluntary by looking at the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 224-25 (1973). See also United States v. Williams, 793 F.3d 957, 962 (8th Cir. 2015) ("To determine whether a statement is voluntary [the Court] examine[s] the totality of the circumstances…."). Furthermore, the Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'…." Colorado v. Connelly, 479 U.S. 157, 167 (1986). See also United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (per curiam); United States v. Robinson, 20 F.3d 320, 322 (8th Cir. 1994). In short, "[a] statement is involuntary when it [is] extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (internal quotation marks and citation omitted).

The focus of Defendant's motion to suppress his September 4, 2019 statements is his position that the Government has not established he knowingly and voluntarily waived his Miranda rights with respect to those statements. It is well-settled that a valid waiver of Miranda rights must be voluntary, knowing and intelligent. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The Government has the burden to establish a knowing and voluntary waiver by a preponderance of the evidence. Colorado, 479 U.S. at 168. Importantly, a voluntary waiver need not be explicit and may be "inferred from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). To determine whether a defendant has validly waived his Miranda rights, a court engages in a two-step inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

7

>or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986). The waiver question "must be determined on the particular facts and circumstances surrounding the case. Butler, 441 U.S. 369, 373 (1979). The giving of Miranda warnings followed by an uncoerced statement is not alone sufficient to establish a valid waiver. Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). If, however, the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. Id. at 384. Additionally, a right to counsel is not invoked except unambiguously. Davis v. United States, 512 U.S. 452, 459 (1994) (a defendant "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney"). A statement, such as, "I think I should get [a lawyer]" is not an unequivocal invocation of a defendant's right to counsel. United States v. Mohr, 772 F.3d 1143, 1146 (8th Cir. 2014). See also United States v. Havlik, 710 F.3d 818, 822-23 (8th Cir. 2013) (The phrase "I guess you better get me a lawyer then" is not an unambiguous or unequivocal request for counsel).

Here, Detective Nardoni's testimony and the recordings of his four interview sessions with Defendant satisfy the Government's burden to prove that Defendant knowingly and voluntarily waived his Miranda rights with respect to each interview session. Defendant responded affirmatively at the beginning of each session, immediately after Detective Nardoni advised Defendant of each of his Miranda rights, that Defendant understood those rights. The fact that during one or more sessions Defendant answered less audibly or more clearly that he understood his Miranda rights, does not invalidate the fact that he did acknowledge an understanding of those

rights before questioning or discussion began in each of those sessions. Nothing in any of the sessions reveals coercive tactics by either Florissant detective conversing with Defendant. Nor does the recording of any of the four sessions reveal any difficulty Defendant had in understanding either Detective Nardoni or responding to any inquiry. The record clearly establishes that Defendant understood his Miranda rights.

Defendant claims that at the start of the second interview he stated "do I get to call my lawyer." The recording of that interview shows that initially Defendant responded in that manner when Detective Nardoni first asked Defendant whether he understood his Miranda rights. This statement, however, is not the type of unequivocal, unambiguous invocation of the right to counsel sufficient to undermine or revoke a valid Miranda waiver.

Defendant also claims he was "under the influence" when he waived his rights and made statements. The Eighth Circuit has "repeatedly declined to adopt a per-se rule of involuntariness when confronted [with claims] of intoxication and/or fatigue." United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (intoxication did not render Miranda rights waiver and confession involuntary). Rather, the test of voluntariness is whether a mental impairment causes a defendant's will to be overborne. United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (voluntariness of confession). Defendant has presented no evidence which supports a conclusion that his will was overborne because he was "under the influence." Moreover, a review of Detective Nardoni's testimony during the hearing, and the recordings of his interviews with Defendant, demonstrate that Defendant was not cognitively impaired, much less impaired to such an extent that he could not understand his Miranda rights or that he waived those rights.[10] The evidence before the Court

---

[10] In Defendant's motion to suppress statements [ECF No. 31 at 4] and his supplemental post-hearing brief in support of that motion [ECF No. 43 at 5], defense counsel states the following: "Counsel has discussed this matter on numerous occasions in person with Mr. Williams and Mr. Williams has stated to Counsel that he was under the influence at the time and did not fully understand his rights." Needless to say, statements in a brief that are not supported by the record

9

discloses no evidentiary basis supporting Defendant's assertion that he was under the influence at the time of any of the interviews on September 4, 2019.

B. <u>Warrantless entry and search of Apartment K</u>

Defendant contends that the "key inquiry in this case is whether the 'exigent circumstances' exception to the warrant requirement justifies the actions of the officers in this case." More specifically, Defendant asserts that police relied on "unsubstantiated suspicions of an emergency at 1870 Nottinghill Row (Apt. K)" to "invade" the home in violation of the Fourth Amendment to the United States Constitution.

As an initial matter, the Government raises the question of whether Defendant has standing to object to the search of Apartment K. With respect to the issue of standing, the Government notes that "[a] person challenging the constitutionality of a search must demonstrate a reasonable expectation of privacy in the particular area to be searched." <u>United States v. Bearden</u>, 780 F.3d 887, 892 (8th Cir. 2015). It is well-settled that "Fourth Amendment rights are personal and may not be asserted vicariously." <u>United States v. Davis</u>, 103 F.3d 660, 671 (8th Cir. 1996) (internal quotation marks and citation omitted).

In support of his position that he has standing to object to the search of Apartment K, Defendant asserts that he was, in essence, an overnight guest, and relies on <u>United States v. Wiest</u>, 596 F.3d 906 (8th Cir. 2010). Although in <u>Wiest</u>, the Eighth Circuit articulated the general view that an overnight guest has "some expectation of privacy," it held that the defendant had no legitimate expectation that his possessions were private from his girlfriend who lived in the house and turned his possessions over to the police. <u>Id.</u> at 909-10. Unlike the defendant in <u>Wiest</u>, here there is no evidence that Defendant was even an overnight guest in Mr. Tharp's house. In fact,

---

cannot be used to establish a violation of Fourth Amendment rights.

10

according to Detective Charpie's testimony, Mr. Tharp believed Defendant was leaving his house, rather than staying.

In <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998), the Supreme Court stated, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." <u>Id.</u> at 90. Here, Defendant has not established that he was an overnight guest. Because the burden is upon Defendant to establish a reasonable expectation of privacy in the location searched, the Court concludes that he lacks standing to assert a violation of the Fourth Amendment.

Even if Defendant has standing, the Court concludes that the "exigent circumstances" exception supports entry into the apartment.[11] The Eighth Circuit "has long held the view that legitimate concern for the safety of individuals may constitute exigent circumstances justifying warrantless entries and searches" in a home. <u>United States v. Janis</u>, 387 F.3d 682, 687 (8th Cir. 2004) (internal quotation marks omitted) (quoting <u>United States v. Antwine</u>, 873 F.2d 1144, 1147 (8th Cir. 1989)). To evaluate an assertion of exigent circumstances, "an objective standard is used to evaluate the reasonableness of the officer's belief that exigent circumstances existed." <u>United States v. Selberg</u>, 630 F.2d 1292, 1296 (8th Cir. 1980) (citing <u>Root v. Gauper</u>, 438 F.2d 361, 364 (8th Cir. 1971)).

Here, Florissant police responded to a call of shots fired. Relying on witness accounts, police officers identified a vehicle and an apartment that appeared to be involved in the shooting. Police officers observed blood and shell casings at the vehicle and shell casings outside the apartment. No one inside the apartment responded to the officers' knocking and announcement of

---

[11] Defendant has not challenged the testimonial and written evidence that the apartment resident, Mr. Tharp, consented to the search of Apartment K. While the issue of consent to search need not, therefore, be resolved by the Court, the Court notes Mr. Tharp's consent further supports a determination that the September 4, 2019, warrantless entry into and search of Apartment K was not a violation of the Fourth Amendment.

their presence.  Under the circumstances here, the Government has established the existence of "exigent circumstances" sufficient to permit the officers' warrantless entry into the apartment.  See United States v. Reed, 545 Fed. Appx. 579, 582-83 (8th Cir. 2013) (unpublished per curiam opinion).  Moreover, the evidence indicates that the officers did not actually enter the apartment immediately upon opening the door, but remained at the door's threshold until three individuals inside the apartment approached and complied with the officers' instructions to exit the apartment.

Defendant relies heavily on Smith v. Kansas City, Missouri Police Dep't, 586 F.3d 576 (8th Cir. 2009) in support of his assertion that "exigent circumstances" were not present.  In Smith, the Eighth Circuit cited with approval a case from the Sixth Circuit that held that "unsubstantiated suspicions" do not support a finding of exigent circumstances.  Id. at 580 (citing United States v. Roark, 36 F.3d 14, 17 (6th Cir. 1994)).  In Smith, the court emphasized that the officers in that case had no reason to believe weapons were present in the home they entered without a warrant. Id.  Here, the reverse is true.  Officers had multiple reasons to believe weapons were not only in the apartment but had already been used in a shoot-out between a car on the Nottinghill Row parking lot and the balcony of Apartment K.  Thus, Smith is of no assistance to Defendant.[12]

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Wiley Williams' Motions to Suppress Evidence and Statements taken on September 4, 2019 at 1870 Nottinghill Row Dr. (Apt. K) [ECF No. 31] and to Suppress Statements taken from Defendant on September 4, 2019 [ECF No. 32] be **DENIED**.

---

[12] In his motion, Defendant did not assert that police officers conducted an unlawful protective sweep.  However, in his post-trial supplemental brief [ECF No. 44], Defendant states that "the protective sweep of Apartment K by law enforcement … should have never occurred because law enforcement should have never opened the door to Apartment K."  In light of the Court's conclusion that exigent circumstances justified the warrantless entry, the undisputed evidence that three apparently uninjured individuals without weapons were discovered inside the apartment, and in view of Mr. Tharp's consent to the search of his apartment, Defendant's attempt at contesting the legitimacy of the "protective sweep" fails.

The parties are advised that they have **fourteen (14)** days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in the waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

This matter will be set for trial at a later date before the Honorable E. Richard Webber, United States District Judge.

                                                                                             PATRICIA L. COHEN
                                                                                             UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of May, 2020