**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19CR00778 ERW/PLC |
| | ) | |
| WILEY WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the Memorandum, Report and Recommendation of United States Magistrate Judge Patricia L. Cohen [ECF No. 47], pursuant to 28 U.S.C. § 636(b)(1), recommending Defendant Wiley William's Motion to Suppress Evidence and Statements Taken on September 4, 2019 at 1870 Nottinghill Row Dr. (Apt. K) [ECF No. 31] and Motion to Suppress Statements Taken from Defendant on September 4, 2019 [ECF No. 32] be denied.  Defendant filed Objections to the Report and Recommendation [ECF No. 48].  The government did not file a response to Defendant's objections.

**I.      LEGAL STANDARD**

When a party objects to a Report and Recommendation, the Court conducts a *de novo* review of those portions of a report or specified proposed findings to which timely objection is made.  28 U.S.C. § 636(b); *see also United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003).

**II.      DISCUSSION**

The superseding indictment alleges on or about September 4, 2019, Wiley Williams ("Defendant") knowingly and intentionally possessed ammunition, knowing he had previously

been convicted of one or more crimes (Count 1); knowingly and intentionally attempted to distribute a controlled substance, and took a substantial step in furtherance of said attempt (Count 2); and knowingly and intentionally discharged a firearm in furtherance of a drug trafficking crime (Count 3).  Defendant objects to Magistrate Judge Cohen's denial of the motions to suppress and claims the warrantless entry and search of his apartment was unconstitutional.  ECF No. 48 pp. 5-15.  Defendant also objects to Magistrate Judge Cohen's denial of his motions to suppress on the basis that the prosecution did not establish Defendant's knowing and voluntary waiver of his *Miranda* rights.  *Id.* At pp. 1-5.  The Court has reviewed the motions, and the testimony, evidence, and arguments from the evidentiary hearing.  Based on this review, the Court concludes the magistrate judge made proper findings and correctly analyzed the issues. The facts of this case, relevant to the motions to suppress, are as follows:

On September 4, 2019, at approximately midnight, Florissant Police Sergeant Jarrod Coder ("Sergeant Coder") responded to a 911 call for "shots fired" at 1870 Nottinghill Row, an apartment building.  Sergeant Coder arrived within minutes, and there were several other Florissant officers already present at the scene.  Two of those officers had been in the immediate vicinity and personally heard the gunshots, a fact which they broadcast over the radio.

When Sergeant Coder arrived, some officers escorted him to a silver Jeep parked in the lot outside of the apartment building that one or more witnesses to the shooting had referenced in their 911 call about the shooting.  On the ground near the Jeep, Sergeant Coder noted there were multiple cartridge casings, which are spent shell casings that come from a firearm being discharged.  Sergeant Coder also found pills in baggies, a cell phone, a substance that appeared to be marijuana, a black digital scale, and one black shoe.  While investigating the items on the ground near the Jeep, Sergeant Coder came across a liquid substance which he presumed to be

blood[1] on the driver's side of the Jeep and the ground below it.

Sergeant Coder was able to speak to witnesses to the shooting while on scene.  One witness told him they witnessed a subject on a specific balcony shooting a firearm at the direction of the silver Jeep.  The specific balcony the witness identified was attached to Apartment K.  After receiving this information, Sergeant Coder attempted to contact the occupants of Apartment K.  Specifically, Sergeant Coder, along with other officers, entered the apartment building,[2] approached Apartment K, knocked on the door, and announced the presence of the Florissant Police Department.  Despite multiple attempts to make contact, there was no response from inside Apartment K.  As a result, a Florissant police officer contacted a maintenance worker from the apartment complex who was able to provide a key that would allow access into Apartment K.

Upon receiving the key to Apartment K, Sergeant Coder unlocked and opened the door to Apartment K.  Rather than enter immediately, Sergeant Coder and the other officers stood at the threshold, continued to announce themselves as police, and requested anyone inside to announce themselves.  After several announcements, three people emerged within the apartment.  The individuals were ordered outside the apartment in the hallway.  The individuals complied and were handcuffed for officer safety and assessed for any obvious signs of trauma or injury.

After the three individuals were secured, the officers gave verbal announcements for anybody still inside to show themselves.  When no response was given, the officers did a "tactical protective sweep" of the residence looking for other individuals that may still be hiding within the residence.  Sergeant Coder observed a black tennis shoe identical to the one found

---

[1] The substance was subsequently tested and found to be blood.
[2] Sergeant Coder testified there were cartridge casings on the ground outside of the door to the apartment building, not immediately outside the door to Apartment K as stated in the Report and Recommendation.

outside by the Jeep as well as another black digital scale during the protective sweep.

Detective Jodi Chapie ("Detective Chapie") was another member of Florissant's police department that was summoned to respond to the "shots fired" call at 1870 Nottinghill Row. When she arrived, there were police officers attempting to contact the occupants of Apartment K, and Detective Chapie remained outside of the apartment building.  After a while, Detective Chapie went inside of the apartment building to wait, and another officer brought one of the individuals from inside the apartment, identified as Justin Tharp, over to her.

Detective Chapie took Mr. Tharp over to her patrol vehicle.  As they walked to the car, she introduced herself and asked Mr. Tharp what was going on, to which he replied: "Man, my friend just got into some shit."  After Mr. Tharp was in the patrol car, Detective Chapie explained to him the nature of the investigation, specifically telling him that she was investigating a shooting.  Mr. Tharp told her he and his brother lived at 1870 Nottinghill Row Apartment K; however, he said his brother was not home.  Mr. Tharp told Detective Chapie his friend, Defendant, had text him earlier in the evening asking for a place to stay as he had been displaced from his parents' home, and Mr. Tharp agreed to allow Defendant to stay.  Detective Chapie then asked Mr. Tharp if it would be okay if Florissant Police searched his apartment, and he told her, "Do what they have to do, because this doesn't involve me."  Detective Chapie then presented a "consent to search and seize" form to Mr. Tharp, which he signed [Gov't Exhibit 2] ("consent to search form").  After securing Mr. Tharp's consent, Detective Chapie conveyed his consent to the other officers on the scene.

Detective Mark Nardoni ("Detective Nardoni") also received a call requesting his assistance at 1870 Nottinghill Row regarding a shooting that had just occurred.  After arriving on scene and at the direction of Sergeant Coder, Detective Nardoni took custody of an individual,

4

later identified as Defendant, who had been inside of Apartment K.  Detective Nardoni escorted

Defendant to Detective Nardoni's police vehicle and then transported him to Florissant Police

Department where he was placed in an interview room, which was wired for audio and visual

recording.

After placing Defendant in the room, Detective Nardoni activated the recording devices

to preserve the interview.  Detective Nardoni administered *Miranda* warnings to Defendant

before beginning and asked Defendant if he understood his rights, to which Defendant said "yes,

sir" and nodded his head.  Detective Nardoni then interviewed Defendant regarding the shooting.

At no point during the interview did Defendant request an attorney or ask to terminate the

interview.  Defendant also did not indicate he had any trouble understanding Detective Nardoni,

nor did he appear to be intoxicated or confused.  Defendant told Detective Nardoni he lived in

Hazelwood, Missouri, and at no point did he state he lived at 1870 Nottinghill Row.  He also told

Detective Nardoni he had a gun in his possession while at 1870 Nottinghill Row and he had met

with individuals there who drove a silver Jeep.  He then provided Detective Nardoni with the

nicknames of the individuals who were in the Jeep.

After providing Detective Nardoni with the nicknames, Detective Nardoni returned to the

interview room three additional times on September 4, 2019.  During these interviews, Detective

Nardoni read Defendant his rights under *Miranda* every time before beginning questioning.  At

no time during the conversations did Defendant request an attorney or request to terminate the

conversation.

Sergeant Coder, Detective Chapie, and Detective Nardoni all testified at the evidentiary

hearing.  Additionally, the Government offered the recordings of the four interviews between

Detective Nardoni and Defendant into evidence.  Defendant did not object, and the Court

admitted the recordings into evidence.

### A.     Motions to Suppress Statements Elicited on September 4, 2019

Defendant first objects to Magistrate Judge Cohen's Report and Recommendation on the basis that Defendant's statements given on September 4, 2019, should have been suppressed because Defendant did not knowingly and voluntarily waive his *Miranda* rights.  Defendant contends that while law enforcement attempted to comply with the dictates of *Miranda* by reading him his rights, he did not understand the warnings and therefore did not waive his rights.

In *Miranda v. Arizona*, the Supreme Court held the government may not use statements stemming from a custodial interrogation of a defendant unless it could demonstrate that prior to questioning the accused was advised of his constitutional rights in relation to the questioning. 384 U.S. 436, 444 (1966).  "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."  *Id.*  "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived *[Miranda]* rights' when making the statement."  *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010), (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

"The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel."  *Berghuis*, 560 U.S. at 383, (citing *Davis, supra,* at 460; *Burbine,* at 427).  This does not require an express showing of waiver, but rather "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence."  *Id.* at 384, (quoting *Butler*, 441 U.S. at 376).  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *Id.* at 384.

Here, both Detective Nardoni's testimony and the recorded interviews between Detective Nardoni and Defendant satisfy the government's burden to prove Defendant knowingly and voluntarily waived his *Miranda* rights prior to being interviewed.  In each of the four conversations Detective Nardoni advised Defendant of his *Miranda* rights, and Defendant responded affirmatively each time that he understood those rights.  The record clearly establishes Defendant understood the *Miranda* warning, as well as being void of any coercive tactics used by Detective Nardoni to secure Defendant's statement.  After *de novo* review of the record, the Court agrees the waiver of Defendant's right to remain silent was valid, and the Court will deny Defendant's motions to suppress the statements given by Defendant on September 4, 2019.

**B.    Warrantless Entry and Search of Apartment K**

Defendant also objects to Magistrate Judge Cohen's denial of his motions to suppress evidence and statements.  He claims the entry into Apartment K was illegal and therefore all evidence from the apartment must be suppressed, in addition to suppressing all statements made by Defendant.[3]

The warrantless entry and tactical sweep of Apartment K were lawful. Police officers may not enter a home without a warrant unless justified by exigent circumstances, for example, if lives are threatened, in the case of a suspect's potential immediate escape, or evidence is about to be destroyed. *United States v. Ball*, 90 F.2d 260, 263 (8th Cir. 1996).  When officers decided to open the door to Apartment K, they believed the individuals involved in the shooting were in the apartment, because a witness saw a subject on the balcony attached to Apartment K shooting at individuals near the silver Jeep.  Additionally, Sergeant Coder located blood on the ground near the Jeep, aside multiple cartridge casings, which led him to believe there could be an injured

---

[3] Defendant argues that if the police had not improperly opened the door to Apartment K, Defendant would have never been taken into custody and given 4 statements to law enforcement.

person in Apartment K.  Because the police suspected there may be a shooting victim or an armed person inside of Apartment K, exigent circumstances justified the warrantless entry.  *U.S. v. Arcobasso*, 882 F.2d 1304, 1306 (8th Cir. 1989) ("Because Willis suspected that there may have been a shooting victim or another armed person inside, we agree that exigent circumstances existed to justify the warrantless search.").

The search of Apartment K was done pursuant to voluntary consent. Police may search an area without a warrant or probable cause if the officers obtain voluntary consent from someone possessing authority over the area to be searched.  *United States v. Armstrong*, 16 F.3d 289, 295 (8th Cir. 1994).  "When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."  *United States v. Matlock*, 415 U.S. 164, 171 (1974).  "Voluntariness depends on the totality of the circumstances."  *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997).  The Court should consider the age of the person, general intelligence and education, if they are intoxicated or under the influence of drugs and if they consented after being informed of their right to deny consent.  *Armstrong*, 16 F.3d at 295.  "The relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the premises." *Czeck*, 105 F.3d at 1239.

 Here, the Defendant was staying over at his friend's apartment.  His friend, Justin Tharp, told the police he resided at Apartment K, and he signed the consent to search form.  The Defendant, meanwhile, had told officers he resided in Hazelwood, Missouri.  It was reasonable for the police to believe Mr. Tharp's consent was voluntary. For these reasons, the entry and

search of Apartment K was lawful.

Any evidence obtained from the search or from Defendant's statements to police after his lawful arrest need not be suppressed because the actions of the police officers were lawful and within the limits of the Constitution.

Accordingly,

**IT IS HEREBY ORDERED** that the Report and Recommendation of United States Magistrate Judge [47] is **SUSTAINED, ADOPTED, AND INCORPORATED** herein.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Evidence and Statements Taken on September 4, 2019 at 1870 Nottinghill Row Dr. (Apt. K) [31] and Motion to Suppress Statements Taken from Defendant on September 4, 2019 [32] be **DENIED**.

The trial of this matter as to Defendant Wiley Williams is set on August 24, 2020 at 8:30 a.m. in Courtroom 3N.  Defendant may request a plea hearing with Judge Webber prior to the trial date.

So Ordered this 15th Day of July, 2020.

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE